**FYFE CEMENT & GRAVEL COMPANY,**
Appellant,

v.

**H. E. MATHIS, Appellee.**

No. 6735.

Court of Civil Appeals of Texas.

Amarillo.

Jan. 27, 1958.

Rehearing Denied March 3, 1958.

Underwood, Wilson, Sutton, Heare & Boyce, Amarillo, for appellant.

Alton M. Reeder, Amarillo, for appellee.

PER CURIAM.

H. E. Mathis, appellee instituted this suit in the court below seeking damages against appellant, Fyfe Cement & Gravel Company, a ready-mix concrete corporation on allegations that he ordered from appellant and appellant agreed to deliver all of the ready-mix concrete with a strength test of 2,500 pounds per square inch to be used by appellee in the construction of a house on a lot located at 3014 Mockingbird Lane in the City of Amarillo; that the concrete delivered was defective and was not of the strength ordered; that he discovered after the house was under construction that the concrete in the foundation was cracking, had a test made that showed a test strength of from 500 pounds to 1,700 pounds per square inch; that the City Building Code

required 2,000 pounds per square inch strength; that since the foundation did not meet the requirements of the Building Code the City canceled his permit to build on said foundation, causing him to have to either raze the structure as built or move to another location and that by reason of the company delivering to the appellee defective concrete it became obligated to pay him all damages sustained by reason thereof.

Appellant, by answer, asserted the concrete mix delivered was of uniform consistency and 2,500-pound test strength; that its sole obligation was to deliver and unload concrete in the amount and of the strength ordered; that at no time was it under legal obligation or responsibility of doing anything with it after it was unloaded and that in accordance with the terms of the sale, usage and practice it delivered concrete of the quantity and quality ordered; and that any damages suffered were caused by appellee's failure to properly care for the concrete rather than the failure of appellant to deliver the quality and strength of concrete ordered.

The trial court submitted the case to the jury upon the following One Special Issue:

"Do you find from the preponderance of the evidence that the composition or 'design' of the concrete mixture as delivered to the plaintiff on March 17, 1956, for the foundation of the house at 3014 Mockingbird Lane was not such as to produce concrete having a compression strength of 2500 pounds per square inch at the end of 28 days if properly handled and treated by the purchaser in accordance with approved practice in the business?

"You will answer the foregoing question: 'We find it was such', or 'We find it was not such'."

To said issue the jury answered: "We find it was not such." From such verdict the court rendered judgment for appellee in the amount of $3,029.12, an amount there-tofore stipulated as the damages suffered by appellee as a result of having to abandon the said foundation. From this judgment appellant perfected its appeal to this court.

Appellant fully protected its record by motion for an instructed verdict, by objections to the court's charge, by numerous requested special charges and requested issues, by motion for judgment non obstante veredicto and motion for a new trial. The gist of its contentions was that the mixture delivered was of the strength ordered and its treatment after delivery was the cause of its failure to test the necessary strength.

■ Under our view of the case the trial court submitted the one ultimate issue with the burden properly placed on appellee. The issue was joined in the trial on whether the mixture had the proper amount and quality of ingredients at delivery—the potential to make the necessary strength. Appellant, through its witnesses urged that it did have such mixture and appellee's witnesses contended otherwise. The question for us to decide, as we see the case, is whether there was sufficient evidence of probative force to support appellee's contention that upon delivery the composition or "design" of the mixture—the potential was not such as to produce concrete having the compression strength ordered. We concede appellee would probably have found it difficult to show damages had the test made shown 2000-pound strength, the minimum required by the City Building Code. But since, it did not and the amount of damages was stipulated that question is not before us.

The qualified experts on concrete who testified indicated the customary period recognized in the building trades for curing concrete is 28 days. This fact is material in our case only because the concrete was delivered March 17, 1956 and the strength test made was on April 23, more than 28 days thereafter. The theory on which the trial court tried the case, as evidenced by the method of submission, was whether the

compression strength potential ordered was present in the mixture delivered.

Marvin Templeton, foreman of the construction under question testified he had worked with concrete all his life, even as a school boy for his father; that he was superintendent for the construction company and ran the concrete for the Stanolin Oil Building in Midland; that he was carpenter foreman in building the radar station for the government fifty miles from Albuquerque, New Mexico; and that he occupied the same position in construction of the new Plainview High School, which included supervision of the foundation work. In comparing a piece of concrete from the foundation in question, plaintiffs Exhibit No. 17, with another piece of concrete of proven strength and quality he testified Exhibit No. 17 indicated lack of cement. Fred Cagle, who had been in the concrete business for twenty-three years and had been Veteran Administration Compliance Inspector for the Federal Housing Administration testified to examining the foundation in controversy and inspecting some of the sections thereof. He then testified:

"Q. Based on all your experiences as an inspector and also as a concrete worker, was there some defect in that material that was used in that foundation, Mr. Cagle? A. Yes.

"Q. What, in your opinion, caused that defect, if you know, if you have an opinion? A. It is possibly two reasons, the way I see it.

"Q. All right,· sir. Just state what these two reasons are. A. One reason would be an insufficient cement in the mixture. Another reason would be that the cement that was used was dead quality cement."

C. D. Brown, appellant's witness who operates a testing laboratory for building materials was given a hypothetical question on cross-examination based on facts testified to in the record concerning the treat-ment, test and strength of the foundation in controversy as it compared with the treatment, test and strength of a foundation of requested 2,000-pound strength concrete poured for a house at 3609 Memory Lane. The foundation on Memory Lane had tested from 2,200 to 2,600 pounds per square inch as compared to the test above shown on the foundation in controversy, while the testimony had shown the same treatment was given both foundations. The question was then asked, assuming those facts related to be true, if the witness must conclude there was not enough cement in the mixture in controversy. His reply was:

"A. I will say this, if the concrete was handled on the two jobs in the same manner, both added water and cured and puddled, and you get these two different strengths, the indication is that there was a difference in the concrete delivered to the job.

"Q. Was there a difference in the cement content of the concrete?

"A. Probably."

The testimony of Arthur Farris Seaton, the batcher for appellant company showed he mixed by a chart the gravel, sand, cement and water for certain mixture strengths ordered; that he received his order for the concrete in controversy over an inter-com system connected from the office to the bins holding the separate ingredients; that ready-mix trucks backed under the bins and he dropped the different ingredients by pulling a lever that controls the opening in the bins and that he weighed the ingredients by scales connected therewith. The sand, gravel and cement went from the bins into a tapered hopper; that receptacle has a door at the bottom that he opened by another lever, which he pulled to dump the ingredients into the truck. The water was then run directly into the truck and measured by a water meter.

The testimony also shows that the cement used in the mixture under construction was delivered in bulk by hopper cars,

dropped out of the bottom of said cars into a screw conveyer, which took it over to an elevator. The elevator then took it up to the top of the bin and when the bin got full "it goes over to a pile over here or what we have for storage."

■ Through testimony, both direct and cross, appellant injected many questions into the record such as temperature of the weather, moisture of the ground and air, the length of time the forms were left on the foundation, the amount of water added to make the mixture pour out of the truck and the question of keeping the concrete moist for so many days after it was poured. As we view the case these matters were only evidentiary, to be considered by the jury in passing on the ultimate issue as to whether the mixture delivered had the potential of making concrete of the strength ordered. A parallel situation would be where A ordered from B a grown, mature horse of good flesh capable of weighing 2,000 pounds at the end of a certain period if properly cared for and B, instead of delivering such a horse, delivered a grown, mature horse of good flesh weighing 1,000 pounds. The potential was not there in the horse delivered. The jury has held the potential was not there in the mixture delivered. The law is well-settled that the judgment of the trial court will not be set aside if there is any evidence of a probative nature to support it and that a court of Civil Appeals cannot substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings. Lynch v. McLendon, Tex.Civ.App., 283 S.W.2d 88, and the cases there cited; Panhandle Eastern Pipe Line Company v. Jackson, Tex.Civ.App., 306 S.W.2d 145.

■ Among appellant's many objections to the issue given were the objections that it is a general charge and that it is duplicitous. The issue does contain several questions in one but is framed in such way as to inquire if the composition or "design" of the concrete was not of the strength ordered. Appellant's witnesses testified one way and appellee's witnesses another. As framed it constituted one ultimate question. The mere fact that it was duplicitous did not constitute reversible error as to appellant, especially in view of the fact that the burden of the issue was on appellee. Grieger v. Vega, 153 Tex. 498, 271 S.W.2d 85; Wilson v. Therrell, Tex.Civ.App., 304 S.W.2d 723 (N.R.E.)

■ In the trial court appellant requested twenty-eight Special Issues and brought forward its objections to the court's failure to give each of them. Said issues as requested either asked questions where the evidence was uncontroverted, asked questions on which there was not sufficient evidence of probative force to support them, or made inquiries of an evidentiary nature which were included in the ultimate question given. If twenty-eight questions were asked and that many answered favorable to appellant's contentions that the concrete was not properly treated after being delivered it still would not relieve appellant of liability if the mixture delivered was not of the composition or "design" contracted for in the order. Evidence of its treatment was certainly admissible but only for the benefit of the jury in determining if the concrete delivered was of the strength ordered. The jury had the benefit of 569 typewritten pages of testimony and 39 Exhibits in passing on this question. They resolved the issue against appellant's contentions and we find no good reason for reversing the judgment of the trial court thereon.

Accordingly, the judgment of the trial court is affirmed.

### On Motion for Rehearing

In its motion for rehearing appellant, throughout thirty-two legal size pages, has insistently urged that our original opinion was erroneous and that this case should be reversed and rendered in its favor, or in the alternative reversed and remanded. We are writing further only in an effort to

more plainly show the case as a simple suit involving a breach of a contract of sale and not a complicated situation involving twenty-eight special issues appellant has attempted to make of it.

■ If we did not specifically say so in our original opinion, we say now that appellee's pleadings and the evidence adduced on direct and cross-examination, when considered in their most favorable light, as we are required under the law to consider them, show appellee ordered from appellant and the latter agreed to deliver a certain product—ingredients with the proportion, strength and mixture for making 2,500 pounds per square inch compression strength concrete. The trial court submitted the case on that theory. When considered in its most simple form the jury was asked, in effect "Do you find from a preponderance of the evidence the ingredients delivered *were not such* as to produce the product ordered?" That was the basis of the law suit. That was the ultimate question which had to be submitted in some form. Had the jury answered "It was such" appellant would have been entitled to his judgment. Had the trial court submitted the requested issues and they had been answered favorably to appellant they could not have formed the basis of a judgment because an answer "It was such" *would have constituted a verdict for appellant* and an answer "It was not such" would have constituted a verdict for appellee, the amount of damages having been agreed upon. We believe appellant had a completely fair hearing both on the evidence he offered and the method employed by the court in submission of the case. The jury disagreed with its contentions and we believe the judgment of the court should not be disturbed.

Accordingly, appellant's motion for rehearing is overruled.